IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

3M COMPANY,                                    Case No.: _____

     Plaintiff,

v.

KING LAW CENTER, CHARTERED

     Defendant.

_____/

## PLAINTIFF 3M COMPANY'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff 3M Company ("Plaintiff" or "3M"), by and through its undersigned counsel, hereby files its Complaint and Demand for Jury Trial against King Law Center, Chartered ("Defendant" or "KLCC"), and in support hereof, alleges as follows:

## NATURE OF THE ACTION

1.    This action concerns Defendant's fraudulent, deceptive, and otherwise wrongful conduct to perpetrate a price-gouging scheme on unwitting consumers, including government agencies, during the global COVID-19 pandemic.

2.    Defendant further engaged in wrongful conduct by falsely representing that 3M had a specific procurement process which required Defendant to serve as an Escrow Agent and work with a "3M Escrow Attorney" to secure the sale of purported 3M products.

3.    Throughout its history, 3M has been providing state-of-the art, industry-leading scientific and medical products to consumers worldwide under its famous 3M marks.  Based on longstanding, continuous use, consumers associate the 3M marks uniquely with 3M.  Now, more than ever, consumers are also relying on the famous 3M

marks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century.  This is especially true with respect to 3M's numerous industry-leading healthcare products and personal protective equipment ("PPE"), including Plaintiff's 3M-brand N95 respirators.

4.      Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19.  To assist in the battle, 3M is working around the clock to supply healthcare workers, first responders, and critical infrastructure operators with millions of 3M-brand respirators.  Beginning in January, 3M began increasing its production of 3M-brand respirators, doubling its global output to a rate of 1.1 billion per year, or 100 million per month. This includes 35 million per month being manufactured and distributed in the United States. 3M also is investing in the capital and resources to enable it to double its respirator production capacity once again, to 2 billion globally by the end of 2020.  In the United States alone, 3M plans to be producing respirators at a rate of 50 million per month by June 2020.  And to supplement its U.S. production, 3M also has announced a plan to import 166.5 million 3M-brand respirators from 3M's production facilities overseas.  In the U.S., more than 90 percent of 3M's respirators are going to healthcare and public health users, with the remaining deployed to other critical industries such as energy, food and pharmaceuticals. The U.S. distribution of 3M-brand respirators is being coordinated with the Federal Emergency Management Agency, which is basing allocation decisions on the most urgent needs.

5.      The demand for 3M-branded respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand

while keeping its respirators priced fairly.  **3M has <u>not</u> increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak**.

6.     Unfortunately, any number of wrongdoers seek to exploit the current public health emergency and prey on innocent parties through a variety of scams involving 3M respirators and other products in high demand.  These scams include unlawful price gouging, fake offers, counterfeiting, and other unfair and deceptive practices – all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

7.     In response to fraudulent activity, price gouging and counterfeiting related to 3M respirators that has spiked in the marketplace in response to the pandemic, 3M is taking an active role in combating these activities.  3M's actions include working with law enforcement authorities around the world, including the U.S. Attorney General, state Attorneys General and local authorities, and creating a "3M COVID-19 Fraud hotline" for the United States and Canada that end users and purchasers of 3M products can call for information to help detect fraud and avoid counterfeit products.  3M is also publishing information on its website to help inform the purchasing public about 3M's prices and products so that they can avoid fraud.  Further information about 3M's efforts is set forth in the 3M press release and publication attached as hereto as **<u>Exhibits A and B</u>**.  This Complaint is another part of these efforts.

8.     Despite 3M's extensive efforts during COVID-19, unsavory characters continue their quests to take advantage of healthcare workers, first responders, and others

in a time of need and trade off the fame of the 3M brand and marks.  Defendant is a prime

example of this unlawful behavior.

9.      On or about April 11, 2020, Defendant contacted the Florida Department of

Management Services' ("DMS") State Emergency Operation Center ("SEOC") with an

offer to sell 3M-brand masks.  Defendant is not an authorized distributor of any of 3M's

products and has no right to use 3M's trademarks.

10.      Nonetheless, to confuse and deceive the SEOC, Defendant claimed that 3M

had implemented intricate procedural steps that required the SEOC to engage Defendant

as an escrow attorney and deposit SEOC funds into an escrow account if the SEOC wanted

to buy 3M masks.  Defendant specifically referenced a "3M Escrow Attorney" who

Defendant would work with to draft an "Escrow Agreement" that would allow for the

purchase of the purported 3M masks.

11.      Defendant offered to sell five million 3M-brand N95 masks at over 460%

of 3M's list price.  This offer constituted price gouging by any measure, including under

Section 501.160(2), Florida Statutes.[1]

---

[1] Section 501.160(2), Florida Statutes states, in part:

> Upon a declaration of a state of emergency by the Governor, it is unlawful and a violation
> of § 501.204 for a person or her or his agent or employee to rent or sell or offer to rent or
> sell at an unconscionable price within the area for which the state of emergency is declared,
> any essential commodity including, but not limited to, supplies, services, provisions, or
> equipment that is necessary for consumption or use as a direct result of the emergency.

Governor Ron DeSantis declared a state of emergency on March 9, 2020. *See* Executive Order 20-52.

12.    On or about April 12, 2020, Defendant contacted the SEOC again, furthering the false premise that an authorized supplier and a 3M escrow attorney were being consulted to follow up with the SEOC.

13.    Not only does such price gouging further strain the limited resources available to combat COVID-19, but such conduct justifiably has caused public outrage which threatens imminent and irreparable harm to 3M's brand as Defendant and similar pandemic profiteers promote an improper association between 3M's marks and exploitative pricing behavior.

14.    3M does not – and will not – tolerate individuals or entities deceptively trading off the fame and goodwill of the 3M brand and marks for personal gain.  This is particularly true against those who seek to exploit the surge in demand for 3M-brand products during the COVID-19 global pandemic, which already has claimed tens of thousands of lives worldwide and over 1,000 lives in Florida.

15.    Accordingly, to further protect governmental actors and consumers from confusion and mistake, to reduce the amount of time and energy that government officials are forced to waste interacting with such schemes, as well as to forestall any further diminution to the 3M brand and marks' reputation, fame, and goodwill, Plaintiff brings this lawsuit against Defendant for federal trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and a state claim for unfair and deceptive trade practices.  Plaintiff also seeks preliminary and permanent injunctive relief.  Any damages recovered by Plaintiff will be donated to charitable COVID-19 relief efforts.

5

**PARTIES**

16.     Plaintiff 3M Company is a Delaware Corporation, with its principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144.

17.     On information and belief, Defendant King Law Center, Chartered is a Florida profit corporation with its principal place of business at 225 North French Avenue, Sanford, Florida 32771. The officer of King Law Center, Chartered, Sharon King Dudley, is a member of the Florida Bar.

**JURISDICTION AND VENUE**

18.     The claims for federal trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts II–IV, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely 15 U.S.C. § 1051 *et seq.*  Accordingly, this Court has original and subject-matter jurisdiction over Counts II–IV, pursuant to 28 U.S.C. §§1331, 1338(a), and 15 U.S.C. §1121(a).

19.     The claims for state unfair and deceptive trade practices, asserted in Count I, *infra*, arise under Florida statutory and common law, and are so related to the federal claims asserted in Counts II–IV, *infra*, that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over Count I pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

20.     This Court also has diversity jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

21.     A substantial part of the events giving rise to the claims asserted, *infra*, occurred in this District.  Therefore, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

22.     Defendant is subject to personal jurisdiction in this District.  Therefore, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### I.   Plaintiff

### A.  3M

23.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world.  Today, 3M's portfolio includes more than 60,000 goods and services, ranging from household and school supplies, to industrial and manufacturing materials, to medical supplies and equipment.

### B.  The 3M Brand

24.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more.  3M also uses its famous "3M Science. Applied to Life" slogan in connection with the promotion of its goods and services.  Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

25.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and more.  As such, 3M-branded products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

**C. The Famous "3M" Marks**

26.     Over the past century, Plaintiff has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the inset 3M design mark (together, the "3M Marks"):



27.     Over the past century, products offered under Plaintiff's 3M Marks have enjoyed enormous commercial success (including, without limitation, its 3M-brand N95 respirator).  Indeed, in 2019, alone, sales of products offered under Plaintiff's 3M Marks exceeded several hundred million USD.

28.     Over the past century, products offered under Plaintiff's 3M Marks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

29.     Based on the foregoing, the general consuming public associates the 3M Marks uniquely with Plaintiff and recognizes them as identifying Plaintiff as the exclusive

source of goods and services offered under the 3M Marks.  Based on the foregoing, the 3M

Marks have also become famous among the general consuming public in the United States.

30.     To strengthen Plaintiff's common-law rights in and to its famous 3M Marks,

Plaintiff has obtained numerous federal trademark registrations, including, without

limitation:  U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M

mark in Int. Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration").  *See*

**Exhibit C**.

31.     The '329 Registration is valid, in effect, and on the Principal Trademark

Register.

32.     The '329  Registration is "incontestable" within the meaning of 15 U.S.C.

§ 1065.   Accordingly, the '329 Registration constitutes conclusive evidence of: (i)

Plaintiff's ownership of the 3M Marks; (ii) the validity of the 3M Marks; (iii) the validity

of the registration of the 3M Marks; and (iv) Plaintiff's exclusive right to use the 3M Marks

throughout the United States for, *inter alia*, respirators.

33.     Plaintiff's famous 3M Marks do more than identify Plaintiff as the exclusive

source of goods and services offered thereunder.  Indeed, the famous 3M Marks also

signify to consumers that 3M-brand products offered under the 3M Marks are of the highest

quality and adhere to the strictest quality-control standards.  Now, more than ever,

consumers rely on the famous 3M Marks' ability to signify that products offered under the

3M Marks are of the same high quality that consumers have come to expect of the 3M

brand over the past century.

### D.  Plaintiff's Extensive Efforts to Assist With the Battle Against COVID-19

34.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19.  As Plaintiff states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers":



35.     Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are Plaintiff's 3M-brand N95 respirators.

36.     Inset below is an image of Plaintiff's 3M-brand, Model 1860 respirator:



37.     Authentic N95 respirators reduce exposure to airborne biological particles and liquid contamination when used appropriately.

38.     Based on the exponential increase in demand for 3M-brand N95 respirators, Plaintiff has invested the necessary capital and resources to double its global annual production of 1.1 billion 3M-brand N95 respirators.  *See* Exs. A & B.  **But 3M has _not_ increased its prices**.  *See id.*

39.     Unfortunately, certain third parties do not share 3M's sense of civic responsibility during this time of crisis.  Indeed, opportunistic third parties are seeking to exploit the increased demand for Plaintiff's 3M-brand N95 respirators by offering to sell them for exorbitant prices, selling counterfeit versions of them, and accepting money for 3M-brand N95 respirators despite not having the product to sell and/or never intending to deliver the product to the unwitting buyer—in many instances, a public authority, such as the SEOC, which struggles to address the enormous financial and logistical challenges presented by COVID-19.

40.     Accordingly, to protect consumers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by governmental officials on scams, as well as to protect the widespread reputation and goodwill enjoyed by Plaintiff's carefully curated 3M brand, Plaintiff is working diligently with law enforcement, retail partners, and others to combat unethical and unlawful business practices related to 3M-brand N95 respirators.  For example, in late-March 2019, 3M's Chief Executive Officer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governors Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price gouging.  As shown in the inset image, additional examples of 3M's

efforts to combat price gouging, counterfeiting, and other unlawful conduct during
COVID-19 include:

    a.   3M posted on its website the list price for its 3M-brand N95 respirators so
that consumers can readily identify price gouging (*See* **Exhibit D**);

    b.   3M created a form on its website that consumers can use to report suspected
incidents of price gouging and counterfeiting (*See* **Exhibit E**); and

    c.   3M created a fraud "hotline" that consumers can call to report suspect
incidents of price gouging and counterfeiting:



## II.    Defendant's Unlawful Conduct

41.    Despite Plaintiff's extensive measures to combat price gouging and
counterfeiting of its 3M-brand N95 respirators, these illicit activities continue. Defendant
is a prime example of this unlawful behavior, which is damaging to the 3M brand and
public health.

42.    On or about April 11, 2020, Defendant sent an email titled *3M N95
Particulate Respirators (1860)* (the "Email") to Rosalyn Ingram ("Ingram") of the CMS
SEOC's State Emergency Response Team. *See* **Exhibit F**.

43.     In the Email, Defendant offered to sell to SEOC five million 3M-brand, N95 Model 1860 respirators for $5.85 each.  *See id.*

44.     Defendant's quote of $5.85 per 3M-brand, N95 Model 1860 respirator is more than 460% over 3M's suggested list price of $1.27 per respirator.  *See* Ex. C.

45.     The Email falsely contends that 3M has implemented a set of procedures in which approved distributors and suppliers had to use the Defendant as an escrow attorney to submit a letter of interest and set up an escrow account to acquire 3M-brand N95 Model 1860 respirators.  *See id*.  The Email also purports to have access to 30 million 3M-brand N95 Model 1860 respirators in the United States. *See id*.

46.     In response, on April 12, 2020, Ingram notified the Defendant that the State of Florida was unwilling to wire funds prior to the inspection of items.  *See* **Exhibit G**.

47.     Around three hours later, Defendant responded, "I will notify the supplier and Escrow Attorney for 3M of your delivery and inspection requirements, and follow back up with you shortly."  *See* **Exhibit H**.

48.     On information and belief, Defendant did not contact Ingram again because the 3M-brand, N95 Model 1860 respirators allegedly for sale either do not exist or are counterfeit.

49.     These statements that imply 3M's involvement and that 3M has a complicated escrow procedure that involves Defendant are false and likely to mislead and/or deceive a consumer into believing that Defendant is an authorized distributor of 3M products and/or has an association or affiliation with 3M.

50.     The mere association of 3M's valuable brand with such shameless price gouging harms the brand, not to mention its more serious threat to public health agencies that are under strain in the midst of a worldwide pandemic.

51.     Based on the foregoing, Plaintiff seeks relief against Defendant for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, and deceptive acts and business practices.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Florida's Unfair and Deceptive Trade Practices Act, § 501.201 *et seq.* ("FDUTPA")

52.     Plaintiff realleges and incorporates the allegations in paragraphs 1 through 51 above as though fully set forth herein.

53.     Plaintiff brings this Count I under Section 501.201 *et seq.*, Florida Statutes.

54.     Defendant's wrongful conduct, including unauthorized use of the 3M brand name in the Email, with the intent of confusing and misleading consumers, including the Florida Department of Management Services State Emergency Operation Center, into believing that Defendant is an escrow attorney which authorized distributors and suppliers of 3M products have to use to acquire 3M-brand products, and that Defendant had genuine 3M-brand products for sale, constitutes deceptive trade practices under FDUTPA.

55.     Defendant's wrongful conduct is made even more reprehensible because of Defendant's attempt to exploit a global pandemic for profit, while posing a serious and direct threat to the health and safety of the general public due to the potential misallocation

of valuable resources that are necessary to fight the COVID-19 pandemic and protect health care professionals who are risking their own health and safety fighting the pandemic.

56.     Plaintiff has suffered, and will continue to suffer, irreparable harm as a direct and proximate result of Defendant's bad acts and the conduct complained of herein.

57.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff requests this Court enter judgment in its favor preliminarily and permanently enjoining Defendant's unlawful conduct, award damages and/or penalties, including attorneys' fees and costs, as permitted under the governing law, and award any other and further relief as this Court deems just and proper.

## COUNT II

### Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)) (Use of the 3M Marks)

58.     Plaintiff realleges and incorporates the allegations in paragraphs 1 through 51 above as though fully set forth herein.

59.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

60.     Upon information and belief, Defendant's acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

61.     Upon information and belief, Defendant's use of Plaintiff's standard-character 3M mark to advertise, market, offer for sale, and/or sell purported 3M-brand N95

respirators to consumers at exorbitant prices during a global pandemic also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

62.    Defendant has also falsely held itself and its affiliates out to be an escrow agent of and/or authorized by Plaintiff to sell and/or distribute 3M-branded products.

63.    Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.

64.    Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff requests this Court enter judgment in its favor preliminarily and permanently enjoining Defendant's unlawful conduct, award damages and/or penalties, including attorneys' fees and costs, as permitted under the governing law, and award any other and further relief as this Court deems just and proper.

## COUNT III

### Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c)) (Dilution of the Famous 3M Marks)

65.    Plaintiff realleges and incorporates the allegations in paragraphs 1 through 55 above as though fully set forth herein.

66.    Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

67.    Plaintiff's 3M Marks were famous among the general consuming public before and at the time Defendant began using the 3M Marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators).

68.     Defendant's use of Plaintiff's standard-character 3M mark in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the standard-character 3M mark, such that the mark's established selling power and value will be whittled away.

69.     Defendant's use of Plaintiff's standard-character 3M mark in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the distinctive quality of the standard-character 3M mark, such that famous the mark's ability to identify Plaintiff as the exclusive source of products offered under the 3M Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators) will be whittled away.

70.     Defendant's use of Plaintiff's standard-character 3M mark in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, is likely to dilute the reputation of the standard-character 3M mark, such that the mark's established ability to indicate the superior quality of Products offered under such Marks (including, without limitation, Plaintiff's 3M-brand N95 respirators), will be whittled away.

71.     Defendant's use of Plaintiff's standard-character 3M mark in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M-brand N95 respirators) is likely to dilute the

distinctive quality of the standard-character 3M mark, such that Plaintiff's exclusive association with the mark will be blurred.

72.     Upon information and belief, Defendant's acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

73.     Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by Plaintiff is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirator masks at exorbitantly inflated prices during a global pandemic when Plaintiff's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which Plaintiff's respirator masks are being distributed and sold during the COVID-19 pandemic and significant confusion about Plaintiff's role in the marketplace for masks that are essential to safeguarding public health. Whereas Plaintiff's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms Plaintiff's 3M brand.

74.     Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff requests this Court enter judgment in its favor preliminarily and permanently enjoining Defendant's unlawful conduct, award damages and/or penalties, including attorneys' fees and costs, as permitted under the governing law, and award any other and further relief as this Court deems just and proper.

## COUNT IV

### False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)) (Defendant's "Email")

75.     Plaintiff realleges and incorporates the allegations in paragraphs 1 through 55 above as though fully set forth herein.

76.     Count IV is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

77.     The statements that Defendant made in its Email constitute commercial advertising and/or commercial promotion.

78.     Upon information and belief, the statements that Defendant made in its Email contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendant and/or the products that Defendant allegedly had available for sale.

79.     Upon information and belief, the statements that Defendant made in its Email contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Plaintiff and Plaintiff's 3M-brand products, including, without limitation, Plaintiff's 3M-brand N95 respirators.

80.     Defendant placed its Email into interstate commerce by, inter alia, sending it to at least one Florida Department of Management Services State Emergency Operation Center official's email account, namely, Rosalyn Ingram.

81.     Defendant's Email directly and/or proximately caused and/or is likely to cause Plaintiff to suffer harm in the form of lost sales (including, without limitation, lost

19

sales of Plaintiff's 3M-brand N95 respirators), as well as irreparable diminution to the 3M brand's reputation, fame, and goodwill.

82.    Upon information and belief, Defendant's acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

83.    Plaintiff has suffered, and will continue to suffer, irreparable harm from Defendant's acts and conduct complained of herein, unless restrained by law.  The damage suffered by Plaintiff is exacerbated by the fact that Defendant is advertising and offering for sale 3M-branded N95 respirator masks at exorbitantly inflated prices during a global pandemic when Plaintiff's products are necessary to protect public health.  Such conduct has inspired intense public criticism of the manner in which Plaintiff's respirator masks are being distributed and sold during the COVID-19 pandemic and significant confusion about Plaintiff's role in the marketplace for masks that are essential to safeguarding public health. Whereas Plaintiff's corporate values and brand image center around the application of science to improve lives, Defendant's conduct imminently and irreparably harms Plaintiff's 3M brand.

84.    Plaintiff has no adequate remedy at law.

WHEREFORE, Plaintiff requests this Court enter judgment in its favor preliminarily and permanently enjoining Defendant's unlawful conduct, award damages and/or penalties, including attorneys' fees and costs, as permitted under the governing law, and award any other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Fed. R.

Civ. P. 38(b).

Dated: April 30, 2020                    MCDERMOTT WILL & EMERY LLP

                                         By:   */s/ Joseph M. Wasserkrug*
                                               Joseph M. Wasserkrug
                                               Florida Bar No.: 112274
                                               jwasserkrug@mwe.com
                                               333 SE 2nd Avenue, Suite 4500
                                               Miami, FL 33131-4336
                                               T: 305.347.6501 | F: 305.675.8403

                                               Michael W. Weaver
                                               Illinois Bar No.: 6291021
                                               *(Application for admission pro hac vice*
                                               *forthcoming)*
                                               mweaver@mwe.com
                                               444 W. Lake Street, Suite 4000
                                               Chicago, IL 60606-0029
                                               T: 312.984.5820 | F: 312.277.2972

DM_US 168198065-3.099922.0011

21